Alright, we're happy to begin argument in our second case. Mr. James, we'd be pleased to hear from you. Thank you, Your Honor. May it please the Court, my name is Michael James. I'm an assistant United States Attorney in the Eastern District of North Carolina, and I represent the defendants in this interlocutory appeal of the District Court's denial of qualified immunity to the appellants Stansberry, Roy, and Officer Boyd. So, Mr. James, your case pretty much comes down to this isn't deliberate indifference. If anything, it's negligence, and you don't have respondeat superiors to the two supervisors. Is that pretty much your case? Yes. It better be. It is. I was just wondering why I spent so much time to say that. But yes, that is essentially the And in this interlocutory appeal, we're not challenging any disputed facts. I think we're clearing that in our briefs. There were a number of undisputed, very relevant facts that the District Court did not apparently consider. How do you say it's a specific quote? Where's Mr. Cornegay in all this? Well, the plaintiff did not sue Mr. Cornegay. Wasn't he the one that prepared the computer data sheet? That is correct. He prepared the shoe recreation report and Officer Boyd, he provided that to Officer Boyd. So, you know, you sue them. The interesting thing when I was looking at the lineup of defendants, so you sue the lowest level person and try to make some scapegoat out of him, and then you sue the highest level people, the warden and others, Mr. Roy, who are way removed from the actual problem. And then the guy who, you know, is at the middle level and is preparing the the relevant sheet is nowhere to be found. I mean, what's the story? Well, the District Court did allow, when the District Court denied the motion for summary judgment, the third one, I believe it was, and ordered limited discovery, there was an opportunity to discover who the relevant party would be in this case. And it was in the deposition of Officer Boyd that Officer Cornegay was the officer in charge of OIC. And his duties included generating the information, inputting information in that shoe report. Is there any evidence in the record that shows that Boyd knew that this man was a sex offender? No, no, Your Honor, there is not. There's no evidence of that. Officer Boyd would have to somehow divine that visually looking at Mr. Danzer, that he was in fact a sex offender. That's impossible. Have there been any incidents between the two of them at all? No. And have they gotten in any kind of fight? Absolutely not. In fact, part of the undisputed relevant information that the District Court, the Honorable District Court, did not consider apparently was Danzer's deposition, and I believe and also part of his trial testimony. At 265, Joint Penance 265, he makes clear the point that you're talking about. He had never met Guston, the man who assaulted him, until the day of the assault. He never heard of him. You made the point in your brief that Danzer and Guston had not met before. That is correct, and that comes from the plaintiff, from Danzer. Prior to the assault, they'd never met. In fact, I believe it's at Joint Penance 265. He states that Guston was not on the compound when he was there before, so they never met until the day of the assault and in the undisputed facts. So what you're saying is that given the absence of an alert in the computer handout and given the fact that there was nothing that they hadn't met, that they'd never fought, that there hadn't been an altercation, your view is that there was nothing to put Mr. Boyd on notice. That's correct. And if you're not on notice, you can't be deliberately indifferent. That's correct, Your Honor. To something that you're not on notice. Now, was he on some sort of notice because of the fact that prison inmates were accused of, convicted of various crimes really have a very malevolent attitude towards sex offenders as a client? Well, he would have to somehow know that Mr. Danzer was in fact a sex offender. But isn't that the allegation? I mean, the plaintiff is alleging that to be a fact. You dispute it. We don't have jurisdiction over that. No, I understand that, Your Honor, but what is undisputed is that one is undisputed. The undisputed fact is that according to Mr. Danzer, they had never met. The two men had never met. Well, that doesn't mean that the officer wouldn't have had knowledge in some other way. There was no evidence in the record. Well, but I mean, we're at the summary judgment stage. An allegation has been made. If there's a dispute about that and the district court has resolved that factual dispute against you. I understand. I understand, Your Honor. But in looking at what is undisputed in Mr. Danzer's deposition, Mr. Danzer states he believes that they should have known because that that the prison officials should have known because they're in charge of security. That's what he says in his deposition. That's why he says that that's the basis of his of his saying that they knew because it's that they should have known they're in charge of security of the prison and in charge of security securing all the prisons that under their charge that they should have known. That is the basis of why he says that Officer Boyd knew that he was a sex offender. That that's the sole basis for saying that that they should have known because they're in charge of security. Okay, the court said on at appendix 951 said it is it is a material fact in question as to whether the information provided to Officer Boyd had the separation orders apparent on the report. Okay, what's the basis for that statement by the district court? By the district court? Well, because in the deposition of Officer Boyd, he stated that the SHU rec report would contain the name of individual, his number, and if and if the individuals who had to be that they were in charge of had to be separated from each other. There was no information on the SHU rec report because that as I stated to Judge Wilkinson, the two men had never met before. They never had an altercation before. So therefore, there's no basis upon which Officer Boyd would know that I guess I just didn't understand what the district court was saying there. But that is the basis for why the district court stated that. Wouldn't the SHU report have indicated or at least the plaintiff is alleging that Danzer had been previously assaulted because of his sex offender status? The SHU report would not indicate that. The SHU report, the information that that would contain, that would be contained in what they call the CIM, Central Inmate Monitoring Information. And then you have Century, which is they have two different databases. Okay, well, wouldn't those two reports have been before Boyd, before the officer? The duties that were attached to Officer Boyd, those were not his duties. Those were the duties of other officers and even if that and even if that CIM information and that threat group information had been on a rep report, it would not indicate anything between Mr. Boyd and Mr. Danzer. It still would not have provided him with notice that Danzer was a threat to, excuse me, Mr. Gooson was a threat to Mr. Danzer. All right, maybe that question is better asked of your opponent as to what the factual support is for that statement. All right, and again, I do just want to quickly point out to try to fully answer your question to your satisfaction, Your Honor, that the, that report, that information was not on the SHU rep report. What information was not on the SHU? I'm sorry, the threats, threat group information, the gang affiliation, the information about sex offender status, that is not typically on a SHU rep report. Well, what in the SHU report would have been most likely to alert Mr. Boyd to the fact that there were, that Danzer and Mr. Danzer had never met? There's no information, Your Honor, that could satisfy that because... Were their names mentioned in the SHU report? Their names were mentioned as to those that had to be separated against other individuals. There's no specific... The SHU report did not contain data that said Danzer must be separated by Gooson because they never met. And because they had never met, the way the BOP policy is with separate information, it's very specific. It's with regard to individuals who had past altercations between them, between each other. Now, it lists individuals who had, who were informants, that sort of thing, but it does not contain, there's no BOP policy that... Go ahead, Sergeant. I'm sorry. Is there a SHU report in this record? Well, the SHU report that was actually generated, those are not, those were not kept. That has been logged on. So you're saying that's why there's no SHU report in this record? That's correct. That's why there's no SHU report in the Joint Appendix. Oh, for that specific, for that specific case. Is it undisputed that the SHU report did not contain a separation order for Danzer? That is undisputed. Why is it undisputed if the report is not on the record? Well, even the, excuse me, even the plaintiff does not dispute the fact that there was no, that there was no specific information between Danzer and Houston. Also, it's undisputed that the SHU report did not contain threat group information and, which brought the gang affiliation, and CIN information about sex offenders. That's undisputed. That's not disputed by the, by the Plaintiff's Council either. Thank you. All right, sir. Thank you. All right. Thank you. Now, with respect, with respect to, with respect to the appellant in this case, Officer Boyd, Officer Boyd was not on notice, that he, he had no fair warning that any of his conducts would have been, he violated a constitutional right, or any clearly established law, accepting the facts as stated by the district court. Now, the district court cited as material facts whether the information provided to Officer Boyd had separation orders, and that's what we've just talked about, where the failure to have this information was a policy violation. And, in doing so, district court noted that Officer Boyd left the area unattended, and the fact that Officer Boyd was, was not disciplined. We believe that the district court erred in denying qualified immunity to Officer Boyd on these basis. One, in, each defendant is responsible for their own, for their own violations. And so, stating that there was a policy, some stated policy violation, that would not amount to a constitutional violation on the part of Officer Boyd. So, if the Bureau of Prison had an institutional-wide policy that, institutionally, was somehow inadequate or did not adhere to so-called best practices for sex offenders as, All right. Thank you, Mr. James. You'll have some time for rebuttal. Thank you, Your Honor. Ms. Simpson, let's hear the other side of this. Thank you, Your Honors. May it please the court, my name is Elizabeth Simpson. I represent Mr. David K. Dancer. He is the plaintiff appellee in this case, and he is also the inmate who was assaulted by another inmate. Would you speak up a little? I just want to make sure that I hear you. Can you hear me better now? Yes, I can. I'm trying to get to the microphone. I'll just start by addressing why Mr. Cornegi was not sued in this case. We have no issue with what Mr. Cornegi did. Mr. Cornegi prepared the SHU report and gave it to Officer Boyd, and as far as we know, although we have not seen the SHU report, the SHU report was correct, and he entered all the information he was supposed to enter into the computer. He did not do anything wrong. The stage that we're looking at is actually what Officer Boyd did. I would just say that the main problem is that the defendants seem to want to contest certain facts without saying that they're contesting them, because obviously, if they contest the facts, then really that's an argument they have to make to the jury. But here, we're at the Court of Appeals. It's really telling that they can't make their argument without changing the story as to what the SHU report said. Well, where is the evidence in this case of notice? Notice to Boyd that this was a problem. Essentially, first, we have evidence that Officer Boyd had full access to the CIM and Sentry databases. The SHU post orders, which are his direct orders for how he's to conduct his job. So you're saying constructive notice is enough? Not constructive. Knowing that he had access to it, and that the CIM and Sentry database are full of notations saying that Dancer's a sex offender, saying that he's been assaulted at least three times because he was a sex offender, saying that Gustin is a member of La Nuestra Familia. There's lots of evidence that the BOP tracks La Nuestra Familia as an extremely dangerous and predatory gang that had the same rules. Are you contending that the SHU report contained the separation notice for these two individuals? Yes, that because of all the all of the information we have received from Sentry and CIM. How could that be if they if they had met? I'm, sorry, that they had met. I don't think it would not say that they had met previously, but it would contain ample information showing that Gustin had a history of assaulting sex offenders, that Dancer was a sex offender, and that Dancer had previously been assaulted various times because he was a sex offender. But because it no longer exists, we don't, we can't really rely on on your assertions, can we? We can look at page 1,000 and page 1,006 of the sealed joint appendix and look at what the database entries look like inside of the Bureau of Prison database, and you can see what kind of information is contained there in on page 1,000. Isn't there an awful lot of hindsight involved in this because you have the people who engage in recreational activities together are just by virtue of the fact that they're in this medium security facility, you know, they're the most, they're volatile individuals and it's so easy to say after a fight breaks out, oh, well, you should have known. But when you have all of these different individuals put together in different combinations day after day after day, it strikes me as unfair to charge with deliberate indifference an altercation between two people, an altercation could break out between any of these two people over things that the someone in Boyd's situation would have no reason on earth to know about. Certainly, and if an altercation broke out between two random individuals, that would be, and if Boyd had walked away for five to ten minutes, which is the other piece of this puzzle that we need to keep in mind, that Officer Boyd did leave his post for about five to ten minutes and leave these two individuals completely unsupervised. So that's step two of the deliberate indifference test. But if Boyd had done that with just any two inmates with no prior knowledge of who those people were, that would be negligence. But what about our case law that talks about they have to actually know there's a risk? And you can, you can, a jury can find, and the key point is a jury can find actual knowledge from the very facts. And how would a jury find that out? Because it was obvious. Because all of the information that Mr. Boyd had, whenever he looked in the computer, whenever he pulled out a shoe report, whenever he pulled someone up to the computer. You're inviting speculation. No, what I'm saying is that everyone on the compound knew that Mr. Dancer was a sex offender. He testified to that. He said that he's been assaulted 15 to 20 times because he's a sex offender. Everyone, inmates and officers alike, knew that he was a sex offender. That made him a hated inmate. And meanwhile, Mr. Gustin is someone who all over his shoe report says, La Nuestra Familia, says he assaulted so-and-so because he was a sex offender. Insulted so-and-so because he was an informant. Extremely dangerous. Has tattoos on his face and entire body showing that he's a member of this dangerous gang. So you have these two individuals, who are not just any two random individuals in medium security, but one who's extremely vulnerable and one who's extremely predatory. And Mr. Boyd, who has his job to monitor this situation and make appropriate assignments, taking into account the information in the CIM Sentry Database, which is there for prison security, he puts these two in the same recreation cage, takes off their handcuffs, and then he leaves the scene totally unattended for five to ten minutes. So to me, that speaks of not just negligence or not just a bad luck, but deliberate indifference or possibly even a deliberate setup. It's very possible that he set up the situation for it to happen. But as long as Boyd is denying it, you know, that's not something that I can prove right here. It has to be a jury who looks Mr. Boyd in the face and decides whether he is telling the truth or lying. Okay, well, I'll continue. Anything further? I do have one thing further. I would like to point to the case v. Ahito, a case from the Seventh Circuit. This is Mr. Posner's opinion. And I think it's pretty similar because it has a situation where you had a very vulnerable inmate, someone who had been identified by the prison psychologist as being vulnerable, and then you had a predatory inmate who had made threats. And you have an officer who left the predatory inmate in a position where he was not secure, not supervised, and what Mr. Posner or Judge Posner said was that it was like leaving a hungry lion in a den and then opening the door. It was a very similar situation here. We have a hungry lion, and Officer Boyd knew that that lion was hungry, and he just put Dancer in there and then left the scene. While Mr. Dancer was left there, these are the things that happened to him. So when Officer Boyd says he left for only a few seconds, that's also not credible. That's something that a jury should hear him say, I only left for a few seconds, and hear that it's incredible because while he was gone, Mr. Gusson took off his jumpsuit, he knocked down Mr. Dancer, he stomped and kicked him about 15 to 20 times, then he wiped the blood off of himself, he passed his bloody shoes through the recreation cage down the line to someone else, he received clean shoes, he put them on, he put on his jumpsuit, and he was acting normally by the time a different officer, Officer Paylor, happened by and saw Dancer slumped on the ground, leaving. So this is all the things that happened while Officer Boyd was away from his post, violating his post orders. These are the same post orders that told him he had to look at the CIM Sentry Database before he made his assignments. We know what information was in the CIM Sentry Database. It was the information I told you about. So that's the case. Ms. Simpson, do you have a case that Judge Keenan asked you about this, that supporting your view that constructive knowledge in the absence of direct knowledge is enough to ward off summary judgment on qualifying? The line that I quoted, the line about knowledge being inferred by the very fact that it's obvious, that's a line from Farmer v. Brennan, that when something is so obvious, the situation is so volatile, a jury can make that jump. Let me give you a case site for the obvious line. That's fine. You cited the case. Yeah, I did. I think that really what we rest on. Is that what you think the district court was getting at in this case? I do think so. I don't think that the district court decision completely captured the full argument, but I think what he was getting at is that this was a case where it was obvious. The district court judge actually presided over the trial. And so he saw Officer Boyd, he saw the criminal trial, I'm sorry, against Mr. Gustin, when Mr. Gustin was convicted of assault, inflicting serious bodily injury. How does constructive knowledge dovetail with the deliberate indifference standard? I mean, maybe you could make a constructive knowledge argument with respect to negligence, but deliberate indifference requires a conscious disregard of a known risk. There's a difference between known and maybe should have known or whatever, but the court phrase is deliberate indifference in terms of a known risk. Yes, Your Honor. And I think what I'm trying to get at is not should have maybe have known, but must have known. It was so obvious that any officer would have known, any officer did know, that Mr. Boyd did know that Dancer was a vulnerable sex offender who had been assaulted many times, and he did know that- Despite the fact they'd never met, despite the fact I would, seems as Judge Keenan says, it's totally speculative that this information was included in the SHU report. I mean, it seems to me we're trying to make a scapegoat of a very low-level official and trying to say, well, all of these different inmates you should know, notwithstanding the absence of information in the SHU report, notwithstanding the absence of any history of prior altercation, you should be able to figure out exactly who's going to get along in the recreation area and who's not. And that seems to me to charge a very low-level official with an awfully high level of knowledge, and we would have to do that in the teeth of a deliberate indifference standard. I mean, these standards of review have to mean something. It just can't let deliberate indifference slide into negligence, and that's always the effort there to conflate the two. And I think the Supreme Court indicated that they're miles apart. I mean, deliberate indifference is above gross negligence, frankly. You have these four standards, negligence, gross negligence, deliberate indifference, and just knowing an intentional inflection of action. And there's a good deal of air and light between each of them. There is, and I think if you look at some of the cases that this court has decided on deliberate indifference, you'll see that air and light, and you'll see why this one comes out on the side of deliberate indifference. One is Parker v. Maryland. That's a clear negligence case, a very tragic situation where one inmate killed another on a prison bus. But there what you have is two inmates who appeared to get along. One had just testified on behalf of the other in a resentencing, and the guards, while somewhat ill-attentive, one was playing on a cell phone, one was looking at a television. They were at their post, they were doing their duty, and they just didn't notice what happened. That's negligence. But this case is different. This is a case where there is actual knowledge. The answer testified that everyone knew that he was a sex offender. And so the fact that Officer Boyd can just say, I didn't know. I mean, Officer Boyd lied in his deposition. At the trial, he said that he knew that sex offenders were a hated group in prison. And then at the deposition, he said he didn't think sex offenders were hated at all. That doesn't make sense. Everyone knows that sex offenders are hated in prison and that they're vulnerable. But why would he change his story like that? That's a sort of a credibility thing that a jury has to hear, not the court of appeals. I think that Officer Boyd did know because all that information was right in front of him, right in the database, and he had a duty to look in the database. So he knew who these two people were, and he left them unattended for five to ten minutes. That's the second piece. The second piece is not just he put them together, whoops. It's that he then walked away and left them there. Thank you, Your Honor. Judge Keenan? Yes, sir. Thank you, Your Honor. I'll be very brief. Judge Keenan, when counsel began her argument, you asked whether this would, if constructive notice could be implied because of the various databases. Counsel stated that she was not talking about constructive notice, but it's clear that, in fact, she was. And Judge Diaz, when you asked counsel, do you have a case that supports that? And counsel stated that Farmer v. Brennan supported that proposition. We would argue that Farmer v. Brennan does not, and I believe it in Farmer v. Brennan at approximately page 840 to 845 deals with that portion of, that could answer your question. Well, let me ask, maybe I've misunderstood the factual record. We don't have the actual reports here, but apparently we have prototypical reports that if, in fact, the information in the databases showed that Ganser had a history of abusing, well, the other way around, he was a sexual offender and his inmate who assaulted him had a history of assaulting sexual offenders. Would that be enough? Even if the officer denied actually looking at the databases, would that be enough to get past summary judgment? Your Honor, one, so the court is asking whether or not if that information was there. All that information is in the databases. Does the officer have a duty to look before deciding how he's going to house these inmates? Officer, the Officer Boyd, who was not in charge of inputting the data in the SHU report, he relied upon another officer inputting that information and then he used the SHU report to make, and the geographical areas to make the actual to make the actual cage assignments. He would not have that information. Even if the information was as the court stated, Officer Boyd himself would not have that information. Now, I would state that. What do you mean by that? He wouldn't have it. It's somewhere in the databases. It may be somewhere in a prison database, but the particular officer who was charged with getting these officer, getting the inmates out for one hour, and I remind the court, for one hour recreation, when you have hundreds of inmates, a one hour, and he has to cycle inmates throughout, for one hour of recreation in the SHU area, that his duty was, his duties were not to, in fact, check multiple databases. That was the responsibility of another officer, Officer Cornegay, whose responsibility was to input information in the SHU report. How many different inmates go through the recreational process in a particular day? I believe, and I believe, I'm trying to recall in this particular case, but I think it was like 99. There were 99 inmates, and what Officer Boyd did when he started. 99 inmates for the whole day. Yes, for his, well, for his, yes, for the whole day, and he was doing the recreation assignments for that day, doing his eight hour shift. 99 different inmates. So the whole point is to make the process run with some degree of efficiency. That's correct. And the way you do that is by having a match and say these two should not be in the recreational area together. That is correct. And you don't want to put that duty officer in a situation of trying to figure out all sorts of things and trying to draw inferences from this and inferences from that. He's got a lot of other things to do. He's got a large number of inmates to try to put in the, in combinations that are not going to result in a conflagration. And the, you know, his, his job is not to prepare all these things or to speculate or to have, oh, well, I think this type of offender is more likely to wreak havoc on this other type of offender, but this other type of offender is less likely because, and it gets into some sort of sociological inquiry. And that's just way beyond what you could expect somebody with these sorts of duties to perform. That's right. It has to be made. He's making decisions with a lot of people and it has to be clear that these two people shouldn't be there together. And the idea that we should be consulting multiple sources and databases, that's not the way to, an institution should be run or would be run. That's correct. And if I may just go to a few more points addressed by, by counsel, Your Honor. One point that was addressed by counsel was was whether getting into what the district court was thinking when the court formulated its order in this case. Now, and this kind of gets into the situation in Winfield v. Bass in which this court sitting on Bonk poured through the various records in the case and the issue after Johnson v. Jones was decided was whether or not how this appellate court was going to look at qualified immunity in interlocutory appeals. And part of the argument was discerning what the district court likely assumed. And well, but don't you think really the thread running through this entire order of the district court is it's just appalled by the gratuitous violence that occurred in this case and then it was very frustrated by the fact that everybody's seeking cover. You know, that wasn't my job, somebody else's job, and here this man was stomped. He could have been killed. I mean, isn't that really what's running through this entire order? That, in fact, may be so, your honor. However, for assigning liability under deliberate indifference standards and getting to whether each defendant knew because each defendant is liable for their own actions, the officers responded quickly once the assault began and, in fact, part of the undisputed facts that were not addressed by the order with regard to defendants, the supervisory defendants, one was Lieutenant Roy. He responded quickly, as did Officer Boyd. They got the up... I see my time is... Go ahead and complete your sentence. Thank you, your honor. They responded quickly. They removed the other prisoners. They got medical attention for Mr. Danzer. Lieutenant Roy, Defendant Roy interviewed a number, interviewed Danzer, and interviewed a number of other prisoners, so they responded reasonably to his assault. Thank you, your honor. We'd like to come down and greet counsel and we'll take a brief recess.
judges: J. Harvie Wilkinson III, Barbara Milano Keenan, Albert Diaz